# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 22, 2008 Session

## STATE OF TENNESSEE v. GEORGE GARNER, JR.

**Appeal from the Criminal Court for Rutherford County**
**No. 59613     Jerry Scott, Judge**

---

**No. M2007-02209-CCA-R3-CD - Filed July 16, 2008**

---

The defendant, George Garner, Jr., appeals his Rutherford County Criminal Court conviction of one count of attempted second degree murder. In this appeal, he contends that the evidence was insufficient and that his sentence is excessive. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

John G. Mitchell, III, Murfreesboro, Tennessee, for the appellant, George Garner, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Jennings H. Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On January 4, 2007, the Rutherford County Grand Jury indicted the defendant on one count of attempted first-degree murder. After a trial on May 30-31, 2007, a petit jury convicted the defendant of the lesser-included offense of attempted second degree murder. Following a sentencing hearing on July 11, 2007, the trial court sentenced the defendant to serve nine years as a Range I, standard offender in the Department of Correction (TDOC).

At trial, Doctor Michael Anderson testified that on September 5, 2006, he treated the victim, Kerry Bynum. The victim is the defendant's son-in-law. Doctor Anderson testified that the victim had a five centimeter laceration on his neck located near the carotid artery and internal jugular vein, and not far from the external jugular vein. The victim's wound was in "very close proximity" to the carotid artery, which would have resulted in "high likelihood of death or significant disability" had it been opened. However, the actual wound suffered was not life threatening.

Jenny Bynum, the defendant's daughter and victim's wife, testified that, less than two weeks before the attack, the defendant left a message for her son Alex on the family telephone. The message explained to Alex that the defendant could no longer see him because of "your mom and [the victim]" and that the defendant would have to do "something drastic" to solve or change the situation.

On cross-examination, Ms. Bynum admitted that the defendant formerly babysat Alex while she worked in the evening. She would pay the defendant $200 a week for his help. However, after an argument in May or June 2006, she and her husband decided that the defendant should no longer be around Alex. Ms. Bynum testified that the defendant had arguments with the victim several times over the years before September 5, 2006.

The victim testified that on the day of the offense, he was with Alex as the head coach of Alex's baseball team. Jenny Bynum had warned the defendant not to attempt to speak alone with Alex. The defendant repeatedly tried to speak with Alex during the September 5, 2006 baseball game, but the victim interrupted those attempts because "[t]hat was not the mother's wishes . . . that was her deal that Alex was not to talk to Mr. Garner without an adult present." The victim testified that the defendant attempted to speak alone with Alex three times: during the game, after the game, and then at the concession stand.

After interrupting the defendant's second attempt to speak alone with Alex, the victim told Alex to go to the concession stand to get a soda for after the game. The defendant followed Alex to the concession stand and again attempted to have a private conversation. The victim broke up this attempted conversation and told Alex to go put the baseball equipment in the car. The defendant followed him to the car, and

> basically, he wanted to talk to Alex, and I told him that anything that he wanted to say to Alex, he could say to Alex with me standing there. He did not want that, and so he had said that he was going to take Alex around the side the building where I was not present to talk to him. I told Alex that, you know, that's not what his mother had said, he knew that, and that it's unfortunate, but that we were going to leave at that point.

The defendant then told Alex not to get into the car, and the victim told him not to listen. The defendant then stated, "[H]e's not getting in that car; if he does, I'm going to kill you." The victim testified that the defendant brought his hand towards the victim's neck, and he "felt a pinch in the skin, [which] reminded [him] of maybe like – not reminded, but I guess I can describe it as like a ring had gotten caught, you know, in [his] neck." The victim grabbed the defendant's wrist and pulled it down away from his throat. The victim then discovered his throat had been cut. During the scuffle after he was cut, the victim heard the defendant scream, "I'm going to kill him." The cut required stitches, so the victim was taken to the hospital by ambulance.

On cross-examination, Mr. Bynum testified that the problems with the defendant started when he married Jenny Bynum about two years before. The defendant did not approve of Ms. Bynum's employment as an exotic dancer, and Ms. Bynum was concerned the defendant would tell Alex. Mr. Bynum testified that he received 15 stitches at the hospital and suffered no significant aftereffects from the cut. Mr. Bynum recorded a taped interview with the police at the hospital in which he did not mention that the defendant said "or I'll kill you" during their confrontation. He claimed he failed to remember this detail because he was still excited from the incident.

Smyrna Police Department Officer Kyle Grisham responded to the scene and collected the defendant's knife as a part of his investigation. Officer Grisham testified, "I remember very vividly [the defendant saying] I wasn't trying to hurt the boy. I was just wanting him to know that I wasn't going to put up with any of his shit." Officer Grisham said the defendant stated he was using the pocketknife to defend himself. On cross-examination, Officer Grisham testified that no one told him that the defendant had said he was going to kill the victim.

Cory McClellan, an off-duty policeman who witnessed the incident, testified that he helped subdue the defendant along with the help of another witness. During the struggle to separate the victim from the defendant, Officer McClellan heard the defendant say "I'm going to kill him." Officer McClellan testified that after the defendant said it a second time, he informed the defendant that he was a police officer and told him to drop his knife. Only then did the defendant stop his threats and release his weapon. On cross-examination, Officer McClellan admitted that his pretrial statement did not include any mention of the defendant's threats.

The defendant chose not to testify.

After sentencing, the defendant filed a timely notice of appeal challenging the sufficiency of the convicting evidence and alleging that the sentence was excessive.

*I. Sufficiency of the Evidence*

The defendant first argues the insufficiency of the evidence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d

832, 835 (Tenn. 1978).  Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id.*

Second degree murder, is the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (2006).  One attempts to commit second degree murder when he or she, acting with the culpability required in Code section T.C.A. § 39-13-210(a)(1), believes the conduct will kill the other person without further conduct on the actor's part.  *Id.* § 39-12-101(a)(2).  A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.  T.C.A. § 39-11-302(b).

Applying the inferences from the evidence most favorable to the State, we conclude that the evidence was sufficient to establish that the defendant knowingly attempted to kill the victim in this case.  The defendant and the victim had a history of prior arguments, and the testimony shows a series of verbal confrontations before the final incident in the parking lot.  Testimony from witnesses showed that the defendant used a knife against the victim, and both the victim and Officer McClellan testified that they heard the defendant verbally threaten to kill the victim.  We hold that the evidence is sufficient to support a conviction on the charge of attempted second-degree murder.

## II.  Length of Sentence

The defendant next alleges that the sentence imposed by the trial court was excessive.  When a defendant challenges the length and manner of service of a sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct.  T.C.A. § 40-35-401(d) (2006).  This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.  *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).  The burden of showing that the sentence is improper is upon the defendant.  *Id*.  If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).  In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment.  T.C.A. § 40-35-210(b); -103(5) (2006); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

The defendant was found guilty of one count of attempted second degree murder, a Class B felony, which carries a sentence range of not less than eight nor more than 12 years. *See* T.C.A. §§ 39-13-210(a)(1), 40-35-112(a)(2). In enhancing the sentence from the statutory minimum by one year, the trial judge used the following enhancement factors: (5), the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense; (6), the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; (9), the defendant possessed a deadly weapon during the commission of the offense; and (10) the defendant had no hesitation about committing a crime where the risk to human life was high. *See id.* § 40-35-114 (5), (6), (9), (10).

The defendant contends that the trial court failed to consider in mitigation that the defendant did not intend to murder the victim, the defendant's lack of criminal history and evidence of good character witnesses, the low likelihood of the crime being repeated, and the defendant's physical disabilities. The defendant also alleges that the trial court failed to properly weigh other mitigating factors, and erred in applying enhancement factors (5), (6), and (10).

As we shall discuss below, three enhancement factors were misapplied. Thus, our review is de novo without a presumption of correctness.

The use of enhancement factor (9) – that the defendant possessed a deadly weapon during the commission of the offense – is supported by the record and not challenged by the defendant.

The use of enhancement factor (5) – that the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense – is not supported in the record. At the sentencing hearing, the court simply stated without elaboration that "[t]he Court finds, first of all, under Tennessee Code Annotated Section 40-35-114, that the Defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense;" however, the record does not support the finding of "exceptional cruelty." Other than suffering a single cut, the victim suffered no other trauma or consequences. This factor was misapplied by the trial court.

We similarly reject the use of enhancement factor (6) – that the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great. The trial record goes into detail as to what injuries the victim *could* have suffered had the knife actually pierced the victim's carotid artery. However, the actual injury suffered by the victim was not life-threatening and was repaired with 15 stitches. Speculative or potential injuries should not be considered in the application of this enhancement factor. This factor was misapplied by the trial court.

Finally, enhancement factor (10) – that the defendant had no hesitation about committing a crime where the risk to human life was high – was also misapplied by the trial court. "In the case of attempted second degree murder, a high risk to human life will obviously exist,"

generally making factor 10 inapplicable to a conviction for attempted second degree murder. *See State v. Jerry B. Crow*, No. 01C01-9310-CR-00348, slip op. at 8-9 (Tenn. Crim. App., Nashville, May 11, 1995). The sentencing court may not utilize an enhancement factor that is itself an element of the underlying offense. T.C.A. § 40-35-114.

Upon our de novo review of the record, however, we conclude the defendant's use of a deadly weapon is sufficient to warrant an enhancement of one year.

We are not persuaded to reduce the sentence or modify the manner of service of the sentence based on the defendant's proposed mitigating factors. We need not belabor the point that we disagree with the defendant's allegations that there was no intent to murder the victim and that this was "an unfortunate result of a passionate encounter," as we have already found the evidence sufficient to uphold the conviction for attempted second degree murder. Similarly, we disagree with the contention that there is a low likelihood of a repeat crime being committed, as the record shows that the family conflict remains unresolved. While we acknowledge the defendant's lack of prior criminal history, evidence of good character, and physical disabilities, we are unpersuaded that these mitigating factors outweigh enhancement factor (9).

In conclusion, although the trial court may have misapplied enhancement factors (5), (6), and (10), we see no basis for modifying the sentence of the trial court.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE